ABIGAIL GREENE, executrix of the will of Albert J. Greene, deceased, appellant,

v.

FRANCIS BUTTERWORTH, respondent.

1. Partnership debts are regarded in equity as both joint and several.

2. Where one of two members of a copartnership dies, the creditors of the partnership may prove their debts against the estate of the deceased member.

3. In such case the individual assets of the deceased member must be first applied in discharge of his individual debts; if there is more than sufficient to pay them, and the partnership assets are not sufficient to pay the partnership debts, the surplus assets of the deceased member may be applied to the payment of the partnership debts.

On appeal from the decree of the orphans court of Camden county.

Mr. C. A. Bergen, for the appellant.

Mr. John F. Harned and Mr. James E. Hays, for the respondent.

THE VICE-ORDINARY.

The principal question presented for decision by the appeal in this case is, whether a decree, made by the orphans court of the

Greene v. Butterworth.

county of Camden, on the 25th day of May, 1888, charging the appellant with $1,690, in addition to the sum with which she charged herself, in an account which she exhibited as the executrix of her husband's will, is correct or not. The testator, Albert J. Greene, died July 21st, 1886. He appointed his wife his sole executrix. She proved his will, and in May, 1887, made a representation to the orphans court of Camden county that her testator's personal and real estate was insufficient to pay his debts, and subsequently, with a view of having the estate declared insolvent, made a report of the claims which had been exhibited against her testator's estate, and also exhibited, under oath, an account of her testator's personal estate and an inventory of his real estate, with the value thereof. The respondent filed exceptions to her account, alleging that she had not charged herself with $1,500, with which she was chargeable, and the decree in question was made on the determination of the issue raised by the filing of such exceptions.

On the argument it was intimated, rather than contended, that the respondent had no right to challenge the correctness of the appellant's account. The ground of this intimation seemed to be that the respondent was not a creditor of the testator. But the proofs show that he was. They show that he loaned the testator $3,100. At the time the loan was made, and for many years prior thereto, the testator had been a member of a copartnership which did business under the name of Greene & Berry. For the money borrowed by the testator he gave the respondent a promissory note signed by himself, but in the name of Greene & Berry. This made the respondent the creditor of both the testator and the copartnership. Partnership debts are regarded in equity as both joint and several. *Story Part.* § *362; Wisham* v. *Lippincott, 1 Stock. 353.* It is true, in distributing the assets of the testator, his separate creditors will be entitled to be first paid, and the partnership creditors will be entitled to be first paid out of the partnership assets (*Davis* v. *Howell, 6 Stew. Eq. 72; S. C. on appeal, 7 Stew. Eq. 292*), but the partnership creditors were creditors of each of the persons composing the copartnership, and, as creditors of the testator, had a right to prove

their debts against his estate. The rule just adverted to clearly recognizes the creditors of the partnership as likewise creditors of the testator, for, as is manifest, its great design is to regulate the order in which his separate creditors and those to whom he was liable as a member of the partnership should be paid. His individual assets are to be first applied in discharge of his individual debts; if there is more than sufficient to pay them, and the partnership assets are not sufficient to pay the partnership debts, the surplus of his individual assets must be applied to the payment of the partnership debts.

There is no dispute that the additional charge made against the appellant, to the extent of $190, is correct. She admits that she found in the testator's room, after his death, between $190 and $200, which she neither put in the inventory of his personal estate nor charged herself with in her account. Her excuse for not having put it in the inventory is, that she was not aware that it was her duty to put it in. She renders no reason for not charging herself with it in her account. The main question presented for decision is, whether or not the appellant was properly charged with the other $1,500.

The following facts bearing on that question are undisputed: That the testator was confined to his bed by the sickness which caused his death, from the 30th day of June, 1886, up to the time of his death; that $1,500 were drawn from two different banks, on the testator's checks, on the 20th day of July, 1886, and delivered to the appellant, enclosed in an envelope, about four o'clock in the afternoon of that day; that the testator died between two and three o'clock the next morning, and that at the time of his death there were $1,700 in money in his house, $1,100 of which the appellant deposited to her own credit in two different banks in the city of Philadelphia, in January, 1887. Unless there are other facts in the case greatly moderating the force of those just stated, it would seem to be entirely clear that the decree appealed from should be affirmed. One of the undisputed facts, it will be observed, puts the sum in dispute in the hands of the appellant, and leaves it there. That, standing alone, would be sufficient of itself to support the decree made

Greene *v.* Butterworth.

below. But the appellant says that it is not true that the money remained in her possession. Her story is this: She says, the testator, between four and five o'clock in the afternoon of July 20th, asked her for the envelope containing the money, and that she gave it to him without asking him why he wanted it or what he was going to do with it, and that she never saw the envelope or the money afterward. She further says, that there were several persons in the testator's room that afternoon whom she did not know—persons who were strangers to her, and whose appearance she cannot describe, but that she did not see the testator pay money to any of them. The evident object of this statement, as to the presence of unknown persons in the testator's room, is to render it possible to conjecture that some of them may have got the money in dispute. But her story is manifestly incredible. No discriminating mind can believe it. The testator was dying when the appellant says he asked her for the envelope containing the money. He died within less than twelve hours afterward. He had been confined to his bed for nearly three weeks, and was extremely weak. A friend, who saw him on the morning of July 20th, says he then looked like a dying man. He signed the two checks, on which the $1,500 were drawn, between ten and twelve o'clock of that day. The effort he made in writing his signature twice doubtless produced complete exhaustion. At the time the appellant says he asked for the envelope containing the money, his condition was such as to render it almost absolutely certain that he cared very little for the things of this world. He must have known that he was in the grasp of death. He was too weak to count or handle the money; he had no need of it or use for it. It is not pretended that there was any one there asking for money, and, therefore, if he had made a request of the kind which the appellant attributes to him, it is highly probable she would have considered it a desire born of delirium; or, if she had believed that the testator was in the full possession of his faculties, and had complied with his request and given him the money, I think it must be regarded as entirely certain that she would, in view of his weak and helpless condition, have kept a close watch upon the

money until she knew what he intended to do with it, or until
it was returned to her.   Nor can it be believed, when the testa-
tor's condition is considered, that the appellant would have
allowed a single stranger to enter his room on the day before his
death, until she first knew who he was, nor unless she was first
convinced that there was some imperative reason why he should
be permitted to do so.

There are other parts of the appellant's evidence which make
it very easy to believe that that part of her story, just criticised,
is a pure fabrication.   She stands self-contradicted.   When first
called as a witness, she testified that she did not have an account
in any bank at the time of her husband's death, and had not
opened one since.   On being again examined on the same subject,
on a subsequent day, she admitted, that about six months after
her husband's death, and more than a year before she first testi-
fied, she had opened an account in two different banks in the city
of Philadelphia.   When first required to state how much money
she had in her possession at the time of her husband's death, she
appeared to be utterly unable to tell.   She pretended to have no
recollection on the subject.   The following are some of the ques-
tions put to her to elicit information on this subject and the
answers she gave :

"*Q.* Did you have any funds in your possession at the time of your hus-
band's death ?

"*A.* Some of my own individual money, not of the estate.

"*Q.* Can you state about what amount of funds you had in your possession
at the time of your husband's death ?

"*A.* No, sir.

"*Q.* Was it $100 ?

"*A.* I can't tell you.

"*Q.* Was it $50 ?

"*A.* What I had belonged to my own individual self.

"*Q.* What amount was it ?

"*A.* I can't tell you.

"*Q.* Can you say whether it was $100 or $200 ?

"*A.* No, sir.

"*Q.* Can you say whether it was $10 ?

"*A.* No, sir ; I can't call it to mind."

Afterward she testified that there was in her husband's house, at the time of his death, $1,700 belonging to her, $600 of which was in her own possession, and the other $1,100 in the possession of a female who had lived with her, as a sort of upper servant, for nearly twenty years.

This $1,700 has a remarkable history. The appellant says, that she brought it to her husband at the time of their marriage, which occurred, according to her statement, more than forty-one years ago. She testified in 1888, so that their marriage must have been solemnized as early as 1847. According to the law then in force in this State, a married woman could not hold personal property distinct from her husband, except through the intervention of a trustee. So far as property rights were concerned, a wife's existence was, at that time, in legal theory, merged in that of her husband, and a husband acquired, by force of the marriage contract, a right to all his wife's personal property. According to the settled convictions of our people, at that time, a wife would have been considered disloyal who refused to let her husband have her money unless he consented to become her debtor. It is highly improbable that the appellant and her husband dealt with each other, in respect to the money which she held at the time of their marriage, on a footing at variance with the law, and contrary to what was then universally understood to be the duty of a wife. And yet the appellant swears, that the $1,700 she brought to her husband at the time of their marriage was always treated by him as her separate property, though he never gave her any writing to show that he was her debtor, and that he paid her interest on it regularly up until about six months before his death, when he paid her the principal. Why he paid her the principal then she does not state. She had no use for it. Her husband had. He was engaged in an extensive business, in which it was necessary for him to use a large amount of money. According to the appellant's story, the $1,700 lay idle, and insecure, in her house for over a year. A month or two after she received it, she says, she gave Mary Taylor $1,100 of it for safe-keeping. Mary is the person who had lived with the appellant, as a sort of upper servant, for nearly twenty years.

The appellant says, that she did not know where Mary put the $1,100, nor where she kept it. Mary says she kept it in the bottom drawer of her bureau, that it remained there a year, and that while it was there she does not remember that she and the appellant ever spoke to each other concerning it. Neither of them was dumb—they could both speak. Mary also testified that, while the $1,100 were in her possession, she went away on a visit, to be absent two or three days, and that before she left she took a deed, which the testator had made to her, out of the drawer in which she kept the $1,100, and gave it to the testator and asked him to put it in his safe for safe-keeping, but left the $1,100 in the drawer. It is impossible for me to believe that anything of that kind ever occurred. A person with sufficient prudence to take precaution looking to the safety of the deed, would, unquestionably, have been equally careful about the safety of the money.

Further recital of the evidence is unnecessary. Enough already appears to render it manifest that the decree made below is the only one which the facts of the case will support. I have no doubt whatever that the $1,100, deposited by the appellant in January, 1887, in two banks in the city of Philadelphia, is a part of the $1,500 which were handed to her on the afternoon of the 20th day of July, 1886.

The decree appealed from will be affirmed, with costs.